JORDAN *v.* KITTLE.

[No. 12,285. Filed February 25, 1926. Rehearing denied June 24, 1926. Transfer denied November 22, 1928.]

*James W. Noel, Hubert Hickam* and *Alan W. Boyd,* for appellant.

*Samuel D. Miller, Frank C. Dailey, William H. Thompson* and *Albert L. Rabb,* for appellee.

McMahan, J.—Complaint by appellee against appellant in three paragraphs. The first paragraph alleges that prior to January 1, 1920, appellant and appellee had numerous mutual dealings, and, on said day, met and cast up their accounts, when it was agreed that

appellant owed appellee $33,985.59, which appellant agreed to pay. That appellant later paid appellee $6,000, leaving a balance of $27,985.59 due appellee. The second paragraph alleges that appellant was indebted to appellee in the sum of $27,985.59 for moneys had and received for the use and benefit of appellee. It also sets out facts touching the transactions between the parties, including statements of the account at different times and payments by appellant to appellee. The third paragraph alleges that prior to January 1, 1920, appellee had loaned appellant various amounts, and that on January 1, 1920, appellant owed appellee $33,985.59, on which he had thereafter made payments aggregating $6,000. To each of these paragraphs of complaint, appellant filed an answer, the first two paragraphs being general denial and payment.

The amended third paragraph of answer alleges that, on and prior to January 1, 1920, appellant was engaged in the ice and coal business under the name of "the City Ice and Coal Company," and in the printing business under the name "Printing Arts Company"; that, appellee was employed by appellant to assist in the management and operation of said ice and coal business and of said printing business, and rendered services for appellant under an agreement that appellant would pay him a salary of $3,600 a year, and, in addition thereto, one-half of the net profits of said ice and coal business and of said printing business, as the same should be determined at the end of each calendar year, and admits that on January 1, 1920, appellant was indebted to appellee under said agreement of employment in the sum of $33,985.59, on which he afterwards had paid appellee $6,000, leaving a balance of $27,985.59 owing by appellant to appellee on said day. It also alleges that, for many years prior to March 24, 1920, appellant and one Rosealba J. Jordan were husband and wife; that said

Rosealba separated from and abandoned appellant in January of that year, making grave charges against him and claiming to have a cause for divorce; that appellant, at all times denied said charges and continuously and repeatedly sought a reconciliation with his wife, at no time desiring that she procure a divorce from him, and that he always opposed any divorce proceedings; that his wife could not be dissuaded from prosecuting a divorce proceeding and, on March 24, 1920, appellant, in order to avoid notoriety and publicity which would be degrading to himself, wife and children, and with the consent of appellee, entered into a written contract with his wife. This contract was set out in the answer and, after stating that the wife claimed to have a cause for divorce and proposed to file a complaint for divorce against appellant, and that they were desirous of avoiding unnecessary litigation and of making a complete settlement of all property rights against each other conditioned upon the granting of a divorce to his wife upon the sole ground of cruel treatment, is, in substance, as follows:

Appellant agreed to convey and deliver to his wife and she agreed to accept in full payment and in lieu of a judgment for alimony and in full satisfaction of all claims and demands against appellant and as a complete division of property rights certain described real estate and securities. Among the property described, was the property and business then and theretofore owned and operated by appellant under the name of the City Ice and Coal Company, including all the real estate, personal property, accounts, and other property pertaining thereto, "subject to a certain contract existing between said Arthur Jordan and John S. Kittle respecting said business and the profits thereof, and subject to such other rights as said John S. Kittle may have acquired therein, . . . such transfer to be conditioned upon the written

consent of said John S. Kittle. The property and business heretofore and now conducted under the name of Printing Arts Company, including the real estate in which said business is conducted and all the personal property, accounts and other property pertaining thereto, . . . subject to all rights of John S. Kittle." Appellant further agreed to execute all transfers and deeds of conveyances necessary to vest a good title in his wife and to deliver such transfers and conveyances with certain enumerated securities to Henry Eitel, who should hold the same in escrow pending judgment in the divorce proceeding, and pending the arrival of the first day of the term of court following the term at which the divorce should be granted his wife, when said Eitel should deliver said transfers, conveyances and property to Mrs. Jordan.

The fourth section of this contract provides: That at the time of the delivery of said transfers, conveyances and personal property by appellant to Henry Eitel, Mrs. Jordan should deliver to said Eitel "in a sealed package not to be opened by him, all affidavits, statements, documents, other writings and things relating to the alleged cause of action for divorce on grounds other than cruel treatment, by whomsoever made," together with affidavits of Mrs. Jordan's attorneys, stating that such affidavits and writings constituted all affidavits, statements and writings in their possession or in the possession of Mrs. Jordan, her agents, or representatives, or in existence to their knowledge, which might in any way reflect upon or make charges against the character or conduct of appellant, and which statements, documents and writings should, at the time of the delivery by said escrow of said assignments, transfers, conveyances, cash and bonds to Mrs. Jordan, be examined and inspected by appellant's attorney and by no other person whomsoever, and, after such examination and inspection, the

same should be burned and destroyed by said escrow in the presence of the attorneys for appellant and his wife.

Some of the property to be conveyed to Mrs. Jordan was owned by appellant and persons other than appellee, as partners. Said agreement also provided that there should be delivered to Eitel a full and complete release of appellant as to all partnership contracts with respect to any and all of the properties and "a full and complete assumption by said Rosealba J. Jordan of any and all liability rising, or which may arise or accrue, against said Arthur Jordan out of any and all of said business or property so transferred, and an agreement to protect said Arthur Jordan against any payment by him on account of any such liability, and the necessary legal steps shall be taken to notify all persons concerned of the dissolution of such partnership and of the retirement therefrom of said Arthur Jordan, subject to the consent of Charles Libby, John S. Kittle and Orlando B. Iles as to the partnerships in which they are respectively interested." Appellant reserved the income and profits from the ice and coal business and the printing business from January 1, 1920, to the date of delivery of said instruments and documents to the respective parties by Eitel.

Appellant also agreed to pay his wife "for her use in the payment of her attorneys $100,000 in cash or acceptable securities," which were to be placed in the hands of said Eitel to be delivered contemporaneously with the delivery of the transfers, conveyances and property to Mrs. Jordan, after the end of the term of court in which said divorce should be granted and not otherwise. It was also agreed therein that if the divorce should not be granted upon the ground of cruel treatment or if it were granted upon grounds other than cruel treatment, or if said proceedings were abandoned by her, Eitel should redeliver to appellant all of said assignments, transfers, and other things, "including attorneys' fees placed in

escrow'' and that Eitel should return to Mrs. Jordan all of said documents and other things which she was required by the agreement to place in escrow, and the agreement thenceforth to be null and void.

Following the signatures of appellant and his wife to this agreement, appellee signed a statement consenting to all of the provisions and terms of the agreement which affected him or which concerned any contract, partnership or other relation of his with appellant, and in which he agreed to execute any and all instruments and to do any and all things necessary and proper on his part to effectuate the contract.

This answer also alleges that appellee, acting as the agent of Mrs. Jordan, investigated the value of appellant's properties and was acquainted with the terms, conditions and purpose of said contract; that appellant refused to execute said contract unless appellee joined therein in the manner above set forth and that, in executing said contract, appellant relied upon such execution by appellee, believing appellee would perform all the things which said contract required of him; that appellant has performed all the terms and conditions of the contract as required of him; that on June 11, 1920, said contract of March 24, 1920, became and thereafter was in full force and effect and that on June 11, 1920, Eitel delivered to appellant a certain instrument reciting that appellant had assigned and transferred to Mrs. Jordan all his rights in the property and business of the said printing company; that appellee and one Warner each had a contract with appellant covering the employment and profits in said business; that Warner and appellee separately released and discharged appellant from any obligation imposed upon appellant and from all liabilities accrued or to accrue against appellant by reason of said business and agreeing that Mrs. Jordan should be substituted for appellant in said contract and agreement

between appellant and said Warner and appellee, and that Mrs. Jordan in consideration of the transfer of said property and business to her, assumed all obligations and all liabilities existing against appellant by reason of said printing business, Mrs. Jordan agreeing to indemnify appellant from the payment of any sum required to be paid by appellant by reason of said business. This agreement was dated May 25, 1920, and was signed by Mrs. Jordan, appellee and Warner.

It is also alleged that at all times after May 6, 1920, Mrs. Jordan and appellee refused to comply with the contract of March 24, as to the business of the ice and coal company and the property connected therewith, and refused to execute a release releasing appellant from liabilities arising out of said business, but that the delivery to said escrow was completed only upon the execution by appellant and his wife of, and the delivery to, said escrow of an agreement which recited that Mrs. Jordan failed to comply with the escrow agreement and to release appellant with respect to the business of the ice and coal company; that it was agreed therein that the matters connected with the ice and coal business should be determined by the contract of March 24, and that appellant did not waive any of the terms of the contract of March 24 by reason of Mrs. Jordan failing to comply with said contract of March 24 by delivering a separate instrument relative to the ice and coal business. This last agreement was dated May 25, 1920, and was signed by appellant in person and accepted by Mrs. Jordan by her attorneys.

That on June 11, 1920, Mrs. Jordan accepted from Eitel certain instruments conveying to her all the property which appellant had agreed to convey to her. In the instrument transferring the ice and coal business to Mrs. Jordan, which was dated May 25, 1920, such transfer was subject to all the rights of appellee in that business

and any share of the profits due him. It also recited that Mrs. Jordan, in accepting that assignment and transfer, assumed all obligations and liabilities against appellant, accrued or thereafter arising out of that business, and agreed to save appellant harmless from the payment thereof. By another and like instrument, appellant transferred the printing business to his wife.

It is further alleged in this paragraph of answer that appellee, who was and is appellant's son-in-law, knew of all the terms and conditions of said contract and transfers and that Mrs. Jordan had agreed to, and intended as soon as she procured the transfer of the ice and coal business and said printing business from appellant, to transfer the same to appellee's wife; that immediately after the transfer of the same to Mrs. Jordan, she transferred the same to appellee's wife; that appellee has since that time managed said properties for his wife, and that appellant entered into the said agreement of March 24, and made said transfers unwillingly and under fear of degrading publicity which would have followed upon a public contest of the charges made by his wife. That Mrs. Jordan and Mrs. Kittle refused to pay appellee said $27,985.59 sued on herein, which amount it is alleged Mrs. Jordan assumed and agreed to pay and that appellee accepted her as his debtor instead of and in place of appellant and completely released and discharged appellant from said indebtedness.

The fourth paragraph of answer admits that appellant was, on January 1, 1920, owing appellee the amount mentioned in the complaint, and alleges the execution of the contract with Mrs. Jordan, the contract being set out in full; that, by virtue of such contract, appellee released appellant and accepted Mrs. Jordan as his debtor in place of appellant; that Mrs. Jordan was granted a divorce in May, 1920, on the sole ground of cruel treatment; that the transfers had all been delivered by Eitel

to Mrs. Jordan and that appellant had performed and done everything required of him by the contract and that he was therefore no longer indebted to appellee.

Demurrers were sustained to the third and fourth paragraphs of answer. The court found the facts specially and concluded as a matter of law that there was due appellee $30,816.88, and judgment was rendered for that amount.

The errors properly assigned are that the court erred in sustaining the demurrers to the third and fourth paragraphs of answer, in the conclusion of law, and in overruling appellant's motion for a new trial.

Did the court err in sustaining the demurrer to the third and fourth paragraphs of answer? The answer to this question depends upon the legality of the contract between appellant and Mrs. Jordan.

Appellee contends that this contract was void on the ground that it was against public policy, and, in so far as the same has not been executed, is binding on no one, as it was an agreement which had for its object and purpose the facilitating and procurement of a divorce. This contention, in our judgment, is well taken. It is the settled law that a husband and wife cannot lawfully enter into a contract for a divorce, and that any agreement made by them to facilitate the procurement of a divorce is against public policy and void. *Muckenburg v. Holler* (1867), 29 Ind. 139; *Everhart v. Puckett* (1881), 73 Ind. 409; *Stokes v. Anderson* (1889), 118 Ind. 533, 21 N. E. 331, 4 L. R. A. 313; *Wilson v. Fahnestock* (1909), 44 Ind. App. 35, 86 N. E. 1037; *Newman v. Freitas* (1900), 129 Cal. 283, 61 Pac. 907, 50 L. R. A. 548; *Hamilton v. Hamilton* (1878), 89 Ill. 349.

In *Muckenburg v. Holler, supra*, appellee brought suit against appellant, who was formerly his wife, alleging that while they were husband and wife and living together, he, at her request, erected a building upon a lot

owned by her and her children by a former marriage, under an agreement that he should take the rents and profits until reimbursed for his expenditures; that he never received any such rents; that he and his wife were afterwards divorced, but, before their divorce, they agreed that he should relinquish his rights to the rents and profits and that she should pay him $200 one day after a divorce should be granted, and that she thereupon executed her written contract to that effect, and he sought to recover said $200 with interest. There having been a judgment rendered against appellant, she appealed and contended that the court erred in overruling a demurrer to the complaint. The court, in sustaining this contention, said: "The special contract for the payment of $200 was contrary to the policy of the law. It was so framed as to have effect only on condition that a divorce should be granted. Its direct tendency was to interest the present plaintiff in procuring a divorce, or in foregoing resistance to an effort by his wife directed to that end. The marriage relation is not thus to be tampered with, and the courts, by contract of the parties, converted into mere registers of their agreements for separation from the bonds of matrimony. The law favors marriage, and cannot therefore sanction contracts intended to promote its dissolution by lending itself to their enforcement. We know of no case in the books in which such an appeal to any court to compel the fulfillment of such a contract, or to award damages for its breach, has been successfully made."

In *Stokes* v. *Anderson, supra,* appellant, under pressure and under threats that his wife intended to bring immediate action for divorce on the grounds of infidelity, was induced to execute certain deeds and instruments conveying certain property to his wife in payment of an indebtedness to her and for alimony. Under the adjustment as agreed upon, appellant was to secure the

payment of $5,000 as alimony, pay the costs and his wife's attorney's fees in the divorce case, and, instead of bringing a charge of infidelity against appellant, he was to be charged with a failure to provide for his wife. The court, in discussing this agreement, said: "This was a mere collusive agreement between husband and wife, whereby the wife was to obtain a divorce from her husband. The agreement in effect was, that Mrs. Stokes would ignore the cause of divorce which actually existed, as she claimed, and allege another, upon which she did not in fact rely; that her husband would make no resistance to the action, but would aid in bringing about the desired result by agreeing to pay the costs and the fee of her attorney. The principal matter, under the arrangement, was the dissolution of the marriage, and incidental thereto the settlement that was made, including the writings which are involved in this action. The entire transaction was one which was against public policy, and therefore the consideration for the signing and delivering of the writings was illegal. As the writings rest upon an illegal consideration, the courts will not recognize or enforce them."

Appellant calls attention to the allegation in his answer to the effect that he at all times denied and disclaimed that his wife had any cause for divorce from him; that he repeatedly sought a reconciliation with her; and at no time desired a divorce from her, but at all times opposed any divorce proceeding or divorce, and says this must be accepted as a showing that the contract was not made to promote or facilitate a divorce. But we hold otherwise.

In this connection we must not lose sight of occurrences which took place prior to the rendition of the divorce, and while that action was pending. Appellant alleges that at all times after May 6, 1920, Mrs. Jordan and appellee refused to comply with the

contract in so far as they were required to release him from any liabilities arising out of the ice and coal business. He sets out a contract dated May 25, 1920, signed by himself and accepted by certain attorneys, one of whom is named in the contract of March 24, as an attorney for Mrs. Jordan, and alleges that the original contract was complied with and carried out upon the execution of said agreement May 25. We can reach no conclusion other than that this last-named agreement made by appellant and attorneys representing his wife was made for the purpose of facilitating the granting of the divorce. Appellant at that time knew his wife was insisting on a divorce. He knew she had refused to assume, and that she had refused also to release appellant from the liabilities arising out of the ice and coal business. With this knowledge, he entered into an agreement with attorneys representing Mrs. Jordan in the divorce suit, in effect, consenting that the decree of divorce might be granted and that the papers and documents in the hands of Eitel might be delivered without any other instruments being signed by Mrs. Jordan. Appellant may have been as anxious to secure the evidence, which Mrs. Jordan claimed to have and which had been deposited with Eitel with directions to destroy, as the attorneys were to secure the $100,000 purse then in the hands of Eitel.

While there is no statement in the contract or in the answer that the $100,000 which appellant agreed to pay Mrs. Jordan, "for her use for the payment of her attorneys," was actually to be paid to her attorneys, no one can read the contract without coming to the conclusion that it was the intention and understanding of the parties that the $100,000 was to be paid to them, and that appellant was, in fact, agreeing to pay them. There is no escape from the conclusion that the effect and purpose of such a statement in the contract was to stimulate

the attorneys representing Mrs. Jordan to procure a divorce for her, and to procure it solely on the ground of cruel treatment, and in securing for appellant the possession of the statements and affidavits which had been placed in the possession of Eitel, and which were to be examined by appellant's attorney and then destroyed. There is nothing in the contract of March 24 stating that it was prepared by the attorneys representing the parties, but it conclusively appears from the agreement of May 6 that the attorneys for Mrs. Jordan were advised of the provisions of the first-named contract, as they, in the last-named contract, which was signed by them, state that it was understood that the transfer of the ice and coal business to her (in the absence of, and in the face of her refusal to sign or release appellant from his liabilities on account of that business) should be determined by the contract of March 24, and that the delivery of the instruments by Eitel, including the $100,000, should not be delayed by reason of such refusal by Mrs. Jordan. Appellant and Mrs. Jordan's attorneys seemingly were interested in having the divorce granted.

It is well settled that if any part of the consideration for a promise is vicious and illegal, the promise will not be enforced. If a promise has several considerations, and one of them is illegal, it renders the promise void. And where a contract is made up of several covenants and agreements with reference to several subjects, and one covenant is illegal, the general rule is, that if the illegal covenant can be eliminated from it without destroying the symmetry as a whole, the court will adopt that view and eliminate the obnoxious provision and enforce the remainder. But, if the good and bad are so interwoven that they cannot be separated without altering or destroying the meaning and purpose of the contract, the good must go with the bad,

and the whole contract be set aside. *Edleson* v. *Edleson* (1918), 179 Ky. 300.

The Supreme Court of Connecticut, in *Boland* v. *O'Neil, Admr.* (1899), 72 Conn. 217, 222, in discussing the right of a husband and wife to enter into contracts relating to a future separation, said: "The mutual enjoyment by the contracting parties of the society and affection of each other, the establishment of the home and family, the birth of children in a wedlock which is both actual and apparent, and the control of them in infancy by both parents, are essential purposes of the marriage relation. Contracts of the parties tending to defeat them will not be sustained either in law or equity. The public have a vital interest in the question whether husband and wife may contract to live apart after their marriage." See, also, *Estate of Yoell* (1913), 164 Cal. 540, 129 Pac. 999.

The agreement, after reciting that Mrs. Jordan was desirous of procuring a divorce, recites that the parties were desirous of avoiding all unnecessary litigation and of settling all property rights, claims and demands, each against the other, "conditioned, however, upon the granting of a divorce to the said Rosealba J. Jordan upon the sole ground of cruel treatment." That appellant agreed to assign certain property and property rights to his wife "in case of and following the granting of such decree of divorce upon the sole ground of cruel treatment." That appellant was to deliver the assignments, transfers and deeds of conveyance, with the bonds referred to, to Henry Eitel, "who shall hold the same in escrow pending the judgment in said divorce proceedings and pending the arrival of the first day of the term of court following the term in which such divorce shall be granted to her." It provided for the destruction of all evidence against appellant relating to any cause of action

for divorce on grounds other than cruel treatment and provided elaborate machinery for this purpose, including: First: That all affidavits, statements, documents, other writings and things relating to the alleged cause of action for divorce on grounds other than cruel treatment be delivered to Eitel "in a sealed package not to be opened by him." Second: That this package was to be accompanied by an affidavit of Mrs. Jordan's attorneys, stating that the papers so delivered constituted all of the papers "in existence to their knowledge and which may in any way reflect upon or make charges against the character or conduct of said Arthur Jordan, and that there are no other duplicates or copies of the same or any part thereof in existence." Third: At the time of delivery to Mrs. Jordan of the bonds and other property, these documents were to be inspected by appellant's attorneys "and by no other person whomsoever." Fourth: Then follows the provision that this evidence "shall be burned and entirely destroyed by said escrow" in the presence of designated attorneys for appellant and his wife. Appellant further agreed to pay "to said Rosealba J. Jordan for her use for the payment of her attorneys, the sum of $100,000 in cash or acceptable securities, the equivalent of cash, at the option of said Arthur Jordan, together with the costs of said divorce proceedings," which cash or securities were to be placed in the hands of the escrow holder to be delivered to Mrs. Jordan "after the end of the term of court in which such divorce shall be granted, and not otherwise." Subdivision 13 of this agreement provides, among other things, that "if a decree of divorce shall not be granted to said Rosealba J. Jordan upon the sole ground of cruel treatment, or if a divorce shall be granted to said Rosealba J. Jordan upon grounds other than cruel treatment, or if said proceedings shall be abandoned by her, then" the escrow holder shall redeliver to appellant all the assignments,

transfers, conveyances, bonds and "attorney fees" placed in escrow, and that the agreement henceforth was to be null and void.

The provision in this contract relating to the payment of attorneys' fees is sufficient in itself to condemn the contract as a whole. The law does not sanction or uphold contracts intended to promote divorce and contracts of that kind are held void as against public policy. Any contract intended to or calculated to facilitate the obtaining of a divorce or to promote the dissolution of the marriage relation is illegal and void. A contract and deed of trust containing a stipulation that a divorce will be procured for the wife at her costs is void. *Rowe* v. *Young* (1916), 123 Ark. 303, 185 S. W. 438.

An agreement by a woman to pay her attorney any part of the alimony recovered in a suit against her husband for divorce is against public policy and void. *McConnell* v. *McConnell* (1911), 98 Ark. 193, 136 S. W. 931, 33 L. R. A. (N. S.) 1074; *Jordan* v. *Westerman* (1886), 62 Mich. 170, 4 Am. St. 836; *Lynde* v. *Lynde* (1902), 64 N. J. Eq. 736, 52 Atl. 694, 97 Am. St. 692. As was said in *Jordan* v. *Westerman, supra:* "Contracts like the one in question tend directly to prevent such reconciliation, and, if legal and valid, tend directly to bring around alienation of husband and wife by offering a strong inducement, amounting to a premium, to induce and advise the dissolution of the marriage ties as a method of obtaining relief from real or fancied grievances which otherwise would pass unnoticed."

Appellant says it does not appear that he had any contract with the attorneys for his wife. He admits, however, that the $100,000 was to be paid to her for her use in paying her attorneys. And, in this connection, appellant cites *Maisch* v. *Maisch* (1913), 87 Conn. 377, in support of the contention that a contract entered into

by the husband with the wife to pay her attorneys' fees and costs in an action for a divorce is valid. The contract in that case was made in South Dakota, and was enforced in Connecticut upon the theory that it was valid in the state where made. It is quite clear, however, that if the contract had been a Connecticut contract, it would have been held void as against public policy.

The contract under consideration clearly indicates that it was the intention and understanding of the parties that the $100,000 was to be paid to the attorneys of Mrs. Jordan upon the condition that divorce was granted to her upon the ground of cruel treatment and that all evidence in the possession of Mrs. Jordan or her attorneys relating to any cause for divorce other than cruel treatment should be suppressed and destroyed, and that a cause for divorce other than the real one should be substituted, and that, when that was done, the divorce should be granted without opposition, and that the attorneys representing the wife should draw down the dazzling and alluring prize. If the attorneys were successful in securing the divorce upon the ground named, the prize was theirs, otherwise not. The direct tendency of such a condition of affairs was to prevent a reconciliation, by offering a tempting inducement to the attorneys to advise and urge the procurement of the divorce.

It is to be observed that the contract between appellant and his wife is divided into sections or paragraphs numbered from one to fourteen. The first paragraph enumerates certain described property which Mrs. Jordan agreed to receive and accept in full payment and in lieu of judgment for alimony, and in full satisfaction of all claims and demands against appellant, and as an entire separation and division of property and property rights between them. Sections 2, 3, 4 and 5 relate to the placing in escrow the necessary assignments and deeds

to convey the property to Mrs. Jordan, the necessary instruments signed by the latter to release appellant from any liability arising out of any business transferred to her, the written evidence in her possession relating to any ground for divorce other than cruel treatment and providing for the destruction of such evidence. Sections 6 and 7 relate to life and fire insurance policies. Sections 8, 9, 10 and 11 relate to the residence property, the division of household goods and wearing apparel, income from the ice and coal business and the Printing Arts Company, and taxes. Then, in section 12, is the provision relating to the $100,000 for the payment of the wife's attorneys, clearly indicating that it was not intended to be given her as alimony or as a part of the division of the property which had been provided for in section 1 of the contract.

Appellant says that separation and settlement agreements in lieu of alimony made in contemplation of divorce are valid and enforceable when not made for the purpose of inducing or procuring a divorce and in the absence of collusion between the parties; that the contract of March 24 is fair and equitable and not calculated to induce divorce and that it did not require any one either to obtain a divorce or to forego resistence thereto. While the parties did not, in so many words, specifically agree that Mrs. Jordan should file a complaint for divorce and that appellant would not resist the granting of a divorce to her, no one can read the contract without being thoroughly impressed with the idea that it was understood by the parties that she should file a complaint for divorce, and if the cause for divorce alleged was cruel treatment, appellant would not contest or resist such action. We cannot escape the conclusion that Mrs. Jordan was in possession of evidence incriminating in character and that she was threatening to bring an action for divorce for reasons other than cruel treatment,

and that appellant was exercised over the matter and very anxious that such a complaint should not be filed against him on any ground that would make public the evidence then in possession of Mrs. Jordan, and that he was willing to allow her to have a divorce without any defense or resistence by him, if she would suppress certain evidence and forego certain grounds for divorce and not make public the evidence in her possession, and which she was threatening to use for the purpose of securing a divorce.

Appellant also contends that even though the contract of March 24 did not constitute a novation, he agreed to and did transfer to his wife, valuable property, relying upon her assumption of the liabilities attached thereto and appellee's agreement to effectuate the assumption by doing all things necessary on his part, including the execution of the necessary instruments to carry out the provisions of the contract, and that to permit appellant to be held liable would be such a palpable fraud that appellee is estopped to assert appellant's liability.

The answer, as heretofore stated, specifically alleges that the contract of March 24 became effective June 11, 1920, and that, on May 6, his wife and appellee refused to comply with paragraph five of the contract which required Mrs. Jordan to deliver to the escrow agent a complete and full release of appellant as to all agreements or relationship with respect to any and all of the properties which were to be transferred to her, and an assumption by her of any and all liabilities arising or which might arise or accrue against appellant out of any and all the business or property transferred to her, in that she and appellee refused to execute a release of appellant from the liabilities arising out of the ice and coal business. It thus appears that, prior to the delivery of the papers which had been placed in the hands of the escrow agent, and so far as the record dis-

closes, before the decree of divorce was entered, appellant knew his wife and appellee had refused and were refusing to be bound by the agreement in so far as it required her to execute a release releasing appellant from his liabilities arising out of the ice and coal business. It does not appear to us that appellant is in position at this time to claim that he acted upon the reliance that his wife and appellee would execute or do anything to release him from his liability to appellee on account of any debt arising out of the ice and coal business.

For other cases discussing the legality of contracts between husband and wife for the purpose of aiding and facilitating the procuring of a divorce see: *Pierce* v. *Cobb* (1913), 161 N. C. 300, 77 S. E. 350, 44 L. R. A. (N. S.) 379; *Rowe* v. *Young, supra; Palmer* v. *Palmer* (1903), 26 Utah 31, 72 Pac. 3, 99 Am. St. 820, 61 L. R. A. 641; *Edleson* v. *Edleson, supra; Loveren* v. *Loveren* (1895), 106 Cal. 509; *Blank* v. *Nohl* (1892), 112 Mo. 159, 20 S. W. 477, 18 L. R. A. 350; *Barngrover* v. *Pattigrew* (1905), 128 Iowa 533, 104 N. W. 904, 111 Am. St. 206, 2 L. R. A. (N. S.) 260; *Lynde* v. *Lynde, supra.*

The court did not err in sustaining the demurrers to the third and fourth paragraphs of answer. The evidence is sufficient to sustain the special finding and the conclusion of law is warranted by the facts found by the court, and is sufficient in form to sustain the judgment.

The judgment is affirmed.